UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| SCOTT KALINA and MELISSA KALINA, | ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) ) |
| UNITED STATES OF AMERICA, | ) ) ) |
| Defendant. | ) |

Case No. 3:19-cv-00492-GCS

## MEMORANDUM & ORDER

**SISON, Magistrate Judge:**

Plaintiffs Scott and Melissa Kalina brought suit against the United States of America on May 9, 2019, pursuant to 28 U.S.C. § 2674 (the "Federal Torts Claims Act" or "FTCA"). (Doc. 1). In their complaint, Plaintiffs allege one count against Defendant for medical negligence and another count for loss of companionship, both stemming from the alleged negligence of Dr. Adele Roth in failing to adequately record Mr. Kalina's symptoms, leading specialists to misdiagnose Mr. Kalina's brain tumor until 2017. *Id.* at p. 1, 4. On October 1, 2016, Dr. Roth joined the Southern Illinois Healthcare Foundation ("SIHF"). (Doc. 21, p.7). As SIHF is eligible for FTCA malpractice coverage, Dr. Roth was also eligible for protection at that time. *Id.* Shortly thereafter, she was deemed an employee of the Department of Health and Human Services pursuant to 42 U.S.C. §§ 233(g)(1)(A), 254b (the "Federally Supported Health Centers Assistance Act" or "FSHCAA"). *Id.* at p. 10. The United States is therefore appropriately substituted for Dr. Roth as defendant in this case.

Now before the Court is Defendant's motion for summary judgment. (Doc. 21). For the reasons delineated below, the motion for summary judgment is **DENIED.**

**FACTUAL ALLEGATIONS**

Mr. Kalina first presented to Dr. Roth on August 30, 2012, complaining of indigestion and a temporary loss of consciousness, known as syncope. (Doc. 21, p. 2). Dr. Roth referred Mr. Kalina to the neurology department at Barnes Jewish Hospital ("Barnes") and ordered a Magnetic Resonance Imaging scan ("MRI") of Mr. Kalina's brain from Memorial Hospital in Belleville, Illinois. *Id.* The September 11, 2012 results indicated a proliferation of cells in the central nervous system and a potential brain tumor. *Id.* The conducting radiologist further recommended imaging surveillance to document stability, with repeat MRIs to be conducted every six months. *Id.* Dr. Roth did not directly inform Mr. Kalina of the MRI results. *Id.* Instead, she wrote on the report, "[r]efer to Neurologist at Barnes." *Id.* The referral coordinator for Dr. Roth's office then handled the referral, though there is no evidence that Mr. Kalina followed through on the referral in 2012 or 2013. *Id.* at p. 2-3.

Dr. Roth's office also converted to an electronic medical record ("EMR") system in August 2012. (Doc. 21, Exh. 2, p. 2). Mr. Kalina's abnormal MRI report was never scanned into the new electronic medical record or recorded on the "Problem List" of the EMR. *Id.* at p. 3. Because no other treating or consulting physicians were aware of the recommendations or the abnormal MRI, Mr. Kalina did not receive bi-annual MRI monitoring. *Id.* Though Dr. Roth continued to treat Mr. Kalina, she did not remember the

abnormal MRI until Mr. Kalina's brain tumor was ultimately diagnosed in October 2017. *Id*.

Instead of complying with the recommendation to conduct bi-annual MRI surveillance of Mr. Kalina's brain, when Mr. Kalina returned to Memorial Hospital with complaints of muscular tremors on April 11, 2013, experts at Memorial Hospital conducted a computerized axial tomography ("CAT") scan. (Doc. 21, p. 3). The CAT scan noted a finding in the region of the abnormality but did not unearth evidence of a tumor. *Id*. The scanning specialists theorized that Mr. Kalina was experiencing tremors as a result of a medication-induced serotonin reaction, and Mr. Kalina was instructed to discontinue taking the drug Effexor. *Id*. When Mr. Kalina again experienced tremors the following day, specialists at Barnes diagnosed him with poisoning by certain medications and instructed him to stop taking those medications. *Id*.

Mr. Kalina's symptoms continued throughout April 2013. On April 23rd, Mr. Kalina complained of body spasms; treating physicians at Barnes conducted an MRI and noted a small finding within the right occipital lobe. (Doc. 21, p. 3). The treating neurologists determined that the MRI results did not correspond with Mr. Kalina's right-sided numbness and indicated that the finding most likely represented a developmental anomaly. *Id*. In order to confirm their findings, the physicians also conducted an electroencephalogram ("EEG"). *Id*. The EGG returned normal results. *Id*. Based on the EEG and MRI results, the physicians diagnosed Mr. Kalina with non-epileptic seizures ("PNES"). *Id*. As PNES are a "physical manifestation of psychologic distress," *id*., Dr.

Roth referred Mr. Kalina to a psychiatrist during a follow up visit on May 9, 2013. Mr. Kalina's symptoms continued to persist throughout 2014 and into 2015, when he began seeing a psychiatrist for talk therapy. *Id.* at p. 4-5.

Mr. Kalina saw Dr. Roth approximately twelve times from 2013 through 2017. (Doc. 21, p. 5). Four of these visits pertained to Mr. Kalina's seizures and other symptoms. *Id.* On June 19, 2015, Dr. Roth ordered an X-Ray of Mr. Kalina's back after he experienced low back pain during his seizures. *Id.* On February 11, 2016, Mr. Kalina saw Dr. Roth for burning with urination and history of fatigue; he also noted that his seizures were increasing in frequency. *Id.* Dr. Roth noted that Mr. Kalina had an upcoming appointment with his neurologist at Saint Louis University ("SLU"). *Id.* On March 8, 2016, Dr. Roth approved a thirty-day heart event monitor related to Mr. Kalina's seizures. *Id.* Finally, on March 31, 2016, during a visit with a physician's assistant on a follow-up from SLU, Mr. Kalina was told non-epileptic seizures were likely. *Id.* The physician's assistant initiated a referral to a neurologist at Missouri Baptist Hospital. *Id.* at p. 6. Shortly after this visit, on October 1, 2016, Dr. Roth became a deemed employee of the Department of Health and Human Services qualifying for FTCA malpractice coverage through SIHF. *Id.* at p. 7.

Dr. Roth remained Mr. Kalina's primary care physician through 2016 and 2017. (Doc. 22, p. 4). However, she failed to schedule an annual physical exam for Mr. Kalina in either 2016 or 2017. *Id.* She also failed to update Mr. Kalina's medical problems list. *Id.* at p. 5. In January 2017, Mr. Kalina went to the emergency room for treatment of his

seizures. *Id*. at p. 6. However, Dr. Roth did not follow-up or address the emergency room visit for Mr. Kalina's escalating seizure activity. *Id*.

Treating physicians first began to suspect that Mr. Kalina had a tumor in 2017. On February 11, 2017, Mr. Kalina underwent a CAT scan and MRI to diagnose a facial infection. (Doc. 21, p. 6). The MRI noted an abnormal lesion in the right occipital lobe; this report was sent to Dr. Roth. *Id*. After reviewing the report, Dr. Roth instructed Mr. Kalina to call his specialist and inform him that he required further testing. *Id*. A follow-up MRI in August 2017 noted a mass-like area in the right occipital lobe suggestive of a tumor. *Id*. On September 19, 2017, another MRI confirmed these findings. *Id*. Physicians resected the lesion by surgery on October 30, 2017. *Id*.

## LEGAL STANDARDS

Summary judgment is proper when the pleadings and affidavits "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. PROC. 56(c); *Oates v. Discovery Zone*, 116 F.3d 1161, 1165 (7th Cir. 1997)(citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). The movant bears the burden of establishing the absence of a genuine issue as to any material fact and entitlement to judgment as a matter of law. *See Santaella v. Metro. Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997)(citing *Celotex*, 477 U.S. at 323). This Court must consider the entire record, drawing reasonable inferences and resolving factual disputes in favor of the non-movant. *See Regensburger v. China Adoption Consultants, Ltd.*, 138 F.3d 1201, 1205 (7th Cir. 1998)(citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). *See also Smith*

*v. Hope School*, 560 F.3d 694, 699 (7th Cir. 2009)(stating that "we are not required to draw every conceivable inference from the record . . . we draw only reasonable inferences") (internal citations omitted). Summary judgment is also appropriate if a plaintiff cannot make a showing of an essential element of his claim. *See Celotex*, 477 U.S. at 322. While the Court may not "weigh evidence or engage in fact-finding[,]" it must determine if a genuine issue remains for trial. *Lewis v. City of Chicago*, 496 F.3d 645, 651 (7th Cir. 2007).

In response to a motion for summary judgment, the non-movant may not simply rest on the allegations in his pleadings; rather, he must show through specific evidence that an issue of fact remains on matters for which he bears the burden of proof at trial. *See Walker v. Shansky*, 28 F.3d 666, 670–671 (7th Cir. 1994), aff'd, 51 F.3d 276 (citing *Celotex*, 477 U.S. at 324). No issue remains for trial "unless there is sufficient evidence favoring the non-moving party for [the fact finder] to return a verdict for that party . . . if the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–250 (citations omitted). *Accord Starzenski v. City of Elkhart*, 87 F.3d 872, 880 (7th Cir. 1996); *Tolle v. Carroll Touch, Inc.*, 23 F.3d 174, 178 (7th Cir. 1994). In other words, "inferences relying on mere speculation or conjecture will not suffice." *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 407 (7th Cir. 2009) (internal citation omitted). *See also Anderson*, 477 U.S. at 252 (finding that "[t]he mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the [fact finder] could reasonably find for the [non-movant]"). Instead, the non-moving party must present "definite, competent evidence to rebut the

[summary judgment] motion." *EEOC v. Sears, Roebuck & Co.*, 233 F.3d 432, 437 (7th Cir. 2000) (internal citation omitted).

## ANALYSIS

The Supreme Court has consistently held that under the Eleventh Amendment to the United States Constitution, "an unconsenting state is immune from suits brought in federal courts by her own citizens as well as by citizens of another State." *Edelman v. Jordan*, 415 U.S. 651, 662-663 (1974), overruled on other grounds by, *Lapides v. Board of Regents of the University System of Georgia*, 535 U.S. 613 (2002)(citing cases). In addition to the fifty states, this sovereign immunity also applies to the United States. *See United States v. Mitchell*, 445 U.S. 535, 538 (1980). However, in some cases, a state may waive the Eleventh Amendment's protections from suit, or Congress may exercise its powers under the Fourteenth Amendment to abrogate sovereign immunity. *See MSA Realty Corp. v. Illinois*, 990 F.2d 288, 291 (7th Cir. 1993). The Eleventh Amendment thus bars suits for money damages brought against a state or the United States by its own citizens or those of another state unless: (i) the state consents to be sued, *see Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 54 (1996); or (ii) Congress validly abrogates the states' Eleventh Amendment immunity. *See Nelson v. La Crosse County Dist. Atty. (State of Wisconsin)*, 301 F.3d 820, 828 (7th Cir. 2002). Congress abrogated the sovereign immunity of the United States when it enacted the FTCA. *See United States v. Orleans*, 425 U.S. 807, 813 (1976); *see also Couch v. United States*, 694 F.3d 852, 856 (7th Cir. 2012).

When a Public Health Service's employee or officer's performance of medical functions causes damages, including personal injury or death, the only available remedy is an FTCA lawsuit against the United States. *See* 42 U.S.C. § 233(a). However, the Secretary of Health and Human Services, or the Secretary's designee (the "Secretary"), may provide liability insurance for any officer or employee of a Public Health Service acting within the scope of their employment. *See* 42 U.S.C. § 233(f). The Secretary may deem an entity a Public Health Service and may deem an individual to be a covered employee of that Public Health Service if certain conditions are met. *See* 42 U.S.C. § 233(g). The FSHCAA grants FTCA coverage for medical malpractice actions to eligible healthcare entities and medical professionals. *See* 42 U.S.C. §§ 233(g)(1)(A), 245b. Dr. Roth joined SIHF on October 1, 2016. (Doc. 21, p. 7). SIHF is a Public Health Service eligible for FTCA malpractice coverage. *Id*. Accordingly, Dr. Roth was not a deemed employee of a Public Health Service until after she joined SIHF in October 2016. *Id*.

As an initial matter, the Court notes that the parties have relied on the continuing violation doctrine to support their claims for and against summary judgment. For instance, Defendant argues that Dr. Roth's alleged negligence occurred prior to the time at which she was deemed an employee of the United States. In that sense, Defendant argues that any acts of negligence Plaintiffs point to which occurred after the date of deeming are actually the on-going effects of a single, continuing violation. (Doc. 21, p. 10). Defendant asserts that the Government has not waived sovereign immunity to hold itself liable for such continuing violations. *Id*. Because Congress has not waived sovereign immunity in order to permit suits for prior negligence, Defendant argues that Plaintiffs'

case is barred by the Eleventh Amendment. *Id*. In the alternative, Defendant asserts that Plaintiffs' claims are barred by the Illinois statute of repose. *Id*.

In response, Plaintiffs argue that the FTCA and FSHCAA permit liability for continuing violations because the FTCA makes the United States liable to the same extent as a private person under Illinois law. (Doc. 22, p. 7). In Illinois, a defendant may be held liable for a continuing course of negligent treatment. *See Cunningham v. Huffman*, 609 N.E. 2d 321, 325 (Ill. 1993). Plaintiffs assert that liability under the continuing violation theory requires the application of substantive law; accordingly, Plaintiffs claim that Illinois state law should apply, and the Court should find that sovereign immunity is waived. (Doc. 22, p. 9)(citing *Crenshaw v. United States*, No. 17-2304, 2020 WL 5579180, *13 (C.D. Ill. Mar. 24, 2020)).

A Congressional waiver of sovereign immunity must be strictly construed in favor of the sovereign. *See Dept. of Army v. Blue Fox, Inc.*, 525 U.S. 255, 261 (1999) (internal citations omitted); *see also Sossamon v. Texas*, 563 U.S. 277, 285 (2011)(citing *Lane v. Pena*, 518 U.S. 187, 192)(1996)). Courts cannot interpret an ambiguous statute as waiving immunity. *See FAA v. Cooper*, 566 U.S. 284, 290 (2012). Instead, a waiver of sovereign immunity must be "unequivocally expressed" in the statutory text. *Id*. at 290-291. If a statute's text is ambiguous, immunity remains if there is a plausible interpretation of the statute which would not authorize money damages against the government. *Id*. at 291. *See also United States v. Nordic Village, Inc.*, 503 U.S. 30, 34 (1992)(construing an ambiguous waiver of sovereign immunity to permit equitable claims, but not claims for monetary damages); *Dellmuth v. Muth*, 491 U.S. 223, 232 (1989)(finding that a "permissible

inference" is not an "unequivocal declaration" necessary to subject States to damages actions).

It is unclear whether the FHCSAA and FTCA waive the sovereign immunity of the United States for continuing violations occurring prior to an employee or entity's deeming. On the one hand, the FSHCAA states that coverage extends only to those employees "acting within the scope of [their] office or employment," indicating that those not yet employed by a Public Health Service are ineligible for coverage. 42 U.S.C. § 233(g)(1)(A). In addition, the regulations governing the deeming process state that coverage only applies to acts and omissions occurring "on and after" the date of deeming. 42 C.F.R. §§ 6.5, 6.6(a). The text does not refer to continuing violations. As such, Defendant argues that this silence must be interpreted in favor of maintaining immunity.

On the other hand, Plaintiffs point out that the FTCA incorporates substantive state tort law because it makes the United States liable in the same manner and to the same extent as a private defendant under like circumstances. *See* 28 U.S.C. § 2674. Indeed, the extent of the United States' liability under the FTCA is generally determined by reference to state law. *See Molzof v. United States*, 502 U.S. 301, 305 (1992); *see also*, *Augutis v. United States*, 732 F.3d 749, 752 (7th Cir. 2013) (internal citations omitted). As such, Plaintiffs claim that the continuing violation doctrine can be used to recover damages prior to Dr. Roth's deeming.

This issue appears to be a case of first impression in this Circuit. The Court's research has also not uncovered any federal cases addressing similar circumstances. The Court, however, does not need to resolve this precise issue now as Plaintiffs have

presented evidence that Dr. Roth's treatment included instances of negligence after she was a deemed employee of a Public Health Service. (Doc. 22, p. 3). Such evidence is sufficient to defeat the summary judgment motion of the United States.

I. **Whether Plaintiffs Allege any Instance of Negligence Occurring after the date of Dr. Roth's Deeming**

Under Illinois law, in order to recover for medical negligence, a plaintiff must demonstrate: (i) the applicable standard of care; (ii) that the medical providers deviated from that standard of care; and (iii) that the deviation from the standard of care was a proximate cause of the injury. *See Johnson v. Ingalls Memorial Hospital*, 931 N.E. 2d 835, 844 (Ill. Ct. App. 2010). A plaintiff must present expert testimony in order to establish these elements, as laypersons are generally not qualified to evaluate medical professional conduct. *See Addison v. Whittenberg*, 529 N.E.2d 552, 556 (Ill. 1988). Here, Plaintiffs allege that Dr. Roth committed negligent acts throughout 2016 and 2017. (Doc. 22, p. 4). In order to establish medical negligence in this case, Plaintiffs rely on the expert evaluation of Dr. Evaleen Jones. (Doc. 22, p. 2).

In her expert report, Dr. Jones identifies the underlying cause of Mr. Kalina's long-misdiagnosed brain tumor, *i.e.*, in August 2012, Dr. Roth failed to record an abnormal MRI report which indicated a possible tumor. (Doc. 21, Exh. 2, p. 3). In Dr. Jones's opinion, "this error – the lack of telling the patient about his abnormal MRI and not recording it in his chart – is the most critical error of this case which led to [Mr. Kalina's] longstanding misdiagnosis of pseudo-seizures and inevitable progression of his brain tumor." *Id*. Because Dr. Roth failed to record or tell Mr. Kalina about the MRI report, "no

other treating or consulting physicians were aware of it." *Id*. "Beginning in Fall 2012 through and including the time that the Government bought Dr. Roth's practice in the fall of 2016 and continuing until it was ultimately diagnosed over a year later in October of 2017 [Dr. Roth] did not remember that she had ordered and received an abnormal MRI in 2012 that required twice yearly follow up MRIs." *Id*.

If this incident were solely responsible for Mr. Kalina's misdiagnosed brain tumor, Plaintiffs' case would be predicated on the ill effects of a single violation. However, Dr. Jones also points to incidents that post-date Dr. Roth's deeming, in which she believes that Dr. Roth's treatment fell below the requisite standard of care. For example, Dr. Jones is of the opinion that a reasonably prudent doctor would have ordered an annual complete physical exam in order to review Mr. Kalina's entire medical history and create a comprehensive treatment plan for Mr. Kalina's "fragmented seizure history." (Doc. 21, Exh. 2, p. 5). However, Dr. Roth did not order any such exams between 2012 and 2017. *Id*. Each instance in which she did not order an exam from October 2016 onward may be actionable in this case, as a reasonable fact finder could conclude that such an omission was a discrete incidence of negligence.

Additionally, had Dr. Roth "created and maintained an accurate and up to date problem list" during each of Mr. Kalina's visits, Mr. Kalina's brain tumor might have been discovered earlier. *Id*. at p. 9. Arguably a discrete instance of negligence occurred each time Dr. Roth saw Mr. Kalina after October 2016 but did not update a problem list with Mr. Kalina's seizure symptoms and the abnormal scan from 2012. Finally, in her deposition, Dr. Jones indicates that Dr. Roth's failure to follow up with Mr. Kalina's care

after he visited the emergency room in January 2017 fell below the requisite standard of care. (Doc. 22, Exh. 1, 93:7-19). Dr. Jones further states that Dr. Roth's failure to follow up after Mr. Kalina's emergency room visit indicates that she failed to adequately continue and coordinate Mr. Kalina's care. (Doc. 22, Exh. 1, 94:8-95:6). In her deposition, Dr. Jones explains that both this failure and Dr. Roth's unorganized medical records indicate that she was not properly acting as the "quarterback" for Mr. Kalina's medical team. *Id*. at 95:10-11, 94:-8-13. This failure to follow up and coordinate Mr. Kalina's care as his condition worsened is another discrete instance of possible negligence without connection to Dr. Roth's first failure to properly record Mr. Kalina's abnormal MRI results. Because Plaintiffs' expert indicates possible discrete incidences of negligent conduct occurring after the date of Dr. Roth's deeming, a reasonable fact finder could conclude that Defendant is liable for these incidences without relying on the continuing violation doctrine. Accordingly, summary judgment is inappropriate on this issue.

## II.     Whether Plaintiffs' Claims are Barred by the Illinois Statute of Repose

Unlike waivers of sovereign immunity, a state's statute of repose is considered substantive law. *See Augutis*, 732 F.3d at 752-753. Illinois imposes a four-year statute of repose on medical malpractice claims. *See* 735 ILCS § 5/13-212(a). This statute bars a plaintiff from bringing a medical malpractice cause of action more than four years after the date on which the alleged act or omission causing the injury occurred. *Id*. Accordingly, Illinois's statute of repose "terminat[es] the possibility of liability" after those four years expire, even if the plaintiff did not yet know they were harmed by the

defendant's actions. *Augutis*, 732 F.3d at 753; *see also Orlak v. Loyola University Health System*, 885 N.E.2d 999, 1003 (Ill. 2007).

Defendant argues that the incidences underlying Plaintiffs' complaint occurred in September 2012, approximately six and one-half years before Plaintiffs filed suit in this case. (Doc. 21, p. 16-17). Defendant frames Plaintiffs' claims as originating when Dr. Roth first received the MRI report, but failed to inform Mr. Kalina of the abnormalities present in the report. *Id.* at p. 16. Moreover, Defendant argues, because Plaintiffs cannot succeed on a continuing violation theory, they cannot use this theory to overcome the statute of repose. *Id.* at p. 19. However, as discussed above, a reasonable fact-finder could determine that Dr. Roth's actions fell below the applicable standard of care after the date of her deeming. *See supra* at p. 11-13. Dr. Roth's failure to coordinate Mr. Kalina's care, to update his problem list after his visits, and to follow up with Mr. Kalina after his visit to the emergency room could each constitute acts of negligence, and each occurred after the date of deeming. As Plaintiffs filed suit in May 2019, their claims fall squarely within the Illinois statute of repose. Summary judgment is therefore inappropriate on this basis.

## CONCLUSION

For the above-stated reasons, Defendant's motion for summary judgment is **DENIED.**

**IT IS SO ORDERED.**

**DATED: September 29, 2021.**

Digitally signed by Judge Sison 2
Date: 2021.09.29 07:08:20 -05'00'

**GILBERT C. SISON**
**United States Magistrate Judge**